UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANADIAN SILICA INDUSTRIES, INC.,

      Plaintiff,

v.

SAND PRODUCTS CORPORATION,

      Defendant.

_____

Case No. 1:20-cv-1229

Hon. Hala Y. Jarbou

GRAYMONT LLC,

      Intervening Plaintiff,

v.

SAND PRODUCTS CORPORATION,

      Defendant.

_____

## **<u>OPINION</u>**

Plaintiff Canadian Silica Industries, Inc. ("CSI") brings this action under diversity jurisdiction against Defendant Sand Products Corporation ("SPC").  CSI alleges that SPC breached a lease agreement between the two parties and seeks declaratory relief with respect to its rights and obligations under the lease agreement.  Before the Court is CSI's motion for partial summary judgment (ECF No. 62) as well as SPC's motion to dismiss and for summary judgment (ECF No. 66).

Plaintiff Graymont LLC ("Graymont") intervened in the action to assert claims of breach of contract against SPC.  Also before the Court are Graymont and SPC's cross motions for summary judgment (ECF No. 63) and (ECF No. 68), respectively.

# I. FACTUAL BACKGROUND

SPC owned and operated a sand mine in Brevort, Michigan, as a family business for decades.  (McKee Dep. 12, ECF No. 69-1.)[1]  The business comprised approximately 1,500 acres of land divided into four parcels: Parcel 1 includes an inactive sand reserve; Parcel 2 includes an active sand mine; Parcel 3 sits just north of State Highway US-2 and includes an entry point for a sand transport tunnel under the highway; and Parcel 4 sits along the shore of Lake Michigan and includes a processing plant as well as a "dock" or shipping terminal with loading equipment.  (Survey, ECF No. 67-2; Canestraight Dep. 33-36, ECF No. 67-3.)[2]  In addition to these parcels, SPC had shipping terminals and distribution sites on Lake Erie in Cleveland, Ohio, and Buffalo, New York.  These shipping terminals along with the Brevort shipping terminal facilitated the efficient transport of sand.  This case centers around a series of agreements between SPC, Graymont, and CSI concerning the Brevort property.

## A. The Access Agreement Between Sand Products and Graymont

Graymont is a Canadian limestone company with plants on the Great Lakes.  (Kehler Dep. 13, ECF No. 64-2.)[3]  Graymont hoped to cultivate a business relationship with SPC to use the Brevort property for shipping and storage.  (*Id.* at 48.)  Discussions between SPC and Graymont began in 2008.  (Canestraight Dep. 14-16.)  On December 31, 2014, SPC and Graymont executed a formal agreement, termed the "Access Agreement."  (Access Agreement, ECF No. 14-1.)  The Access Agreement was to be effective from January 1, 2015, for a period of 30 years.  (*Id.*, PageID.348, 355.)

---

[1] Excerpts of the deposition of Max McKee's, SPC's CEO, can be found at ECF Nos. 62-8 and 69-1.

[2] Excerpts of the deposition of Chuck Canestraight, SPC's President, can be found at ECF Nos. 62-7, 64-3, 67-3, and 69-3.

[3] Excerpts of the deposition of Garry Kehler, Graymont's former VP of business development and general counsel, can be found at ECF Nos. 64-2 and 69-4.

The Access Agreement granted Graymont a non-exclusive right to use the "SPC Facility"—a term the parties used to describe the collection of equipment and land Graymont is entitled to use.  The SPC Facility is located on portions of Parcels 3 and 4.  (*Id.*, PageID.373.)  The Access Agreement refers to the entirety of the Brevort location, meaning Parcels 1-4, as the "SPC Property."  Under the Access Agreement, SPC agreed to provide Graymont with services to assist Graymont in transferring, storing, and loading its products from the dock.  (*See id.*, PageID.352.)  SPC also granted Graymont a right of first refusal to purchase the SPC Facility or SPC Property.  (*See id.*, PageID.364.)

**B. SPC Negotiations to Sell the Business**

Around 2016, SPC began exploring the possibility of exiting the sand business because it "thought it was in [its] best interest to consider allowing someone with a wide footprint and skill set in it to try to continue the development of the Brevort sand into [the proppant and energy] markets."  (Canestraight Dep. 58, 69.)  SPC approached Graymont about the sale of its business.  (*Id.* at 58; Kehler Dep. 58.)  SPC sought approximately $40-48 million for the sand business and approximately $10-15 million for the dock alone.  (*See* Canestraight Dep. 62; Musselman Dep. 24, ECF No. 64-4.)[4]  Graymont was not willing to pay these amounts for either the sand business or the dock.  (*See* Kehler Dep. 70-71; Musselman Dep. 25.)

In late 2016 and early 2017, SPC began negotiations with CSI.  (Canestraight Dep. 67.)  On March 22, 2017, CSI offered to purchase "100% of the assets" of SPC.  (CSI Initial Offer Letter, ECF No. 64-11.)  CSI offered two purchase price options: (1) $35 million plus a contingency payment of $6.5 million or (2) $30 million plus a contingency payment of $6.5 million "if the ownership of the loading dock at the mining operation is retained by your company."  (*Id.*)

---

[4] Scott Musselman is the CFO of SPC.

SPC responded with offers to sell portions of the property but lease others.  (4/3/2017 SPC Counteroffer, ECF No. 64-14; 5/1/2017 SPC Counteroffer, ECF No. 64-16.)

The negotiations ultimately led to the execution of a Letter of Intent on May 3, 2017. (Letter of Intent, ECF No. 1-1.)  Under the Letter of Intent, CSI would purchase SPC's sand mining business—not including Parcels 3 and 4—for $37 million.  (*Id.*, PageID.16.)  CSI would lease Parcels 3 and 4 from SPC for $250,000 per year with a 2% annual increase.  (*Id.*)

The Letter of Intent also acknowledged that SPC's property is subject to Graymont's right of first refusal and required SPC to notify Graymont.  (*Id.*, PageID.17.)  SPC shared the Letter of Intent with Graymont on May 5, 2017.  SPC stated:

> Though the property referred to as the SPC Facility in the Access Agreement is excluded from the sale, Graymont's ROFR extends to the SPC Property in a broader sense.  Let this email serve as our official notice of SPC's intention to transfer property to which Graymont has a Right of First Refusal on the terms outlined in the attached letter of intent.

(5/7/2017 Email from Musselman, ECF No. 69-8, PageID.1336.)  Graymont did not believe the Letter of Intent began the 60-day refusal period because it was not a "bona fide offer for purchase" as required by the Access Agreement.  (Kehler Dep. 92-93.)  At any rate, Graymont "did not think" it wanted to purchase the sand business.  (5/15/2017 Email from Kehler, ECF No. 69-9, PageID.1345.)  Rather, it wanted to "ensure [its] ability to move stone across the dock [would not be] impaired by the proposed changes in ownership."  (*Id.*)  SPC appears to have acknowledged that the 60-day right of first refusal period would not start until Graymont was presented with a purchase and sale agreement.  (*See* 6/21/2017 Email from Canestraight, ECF No. 64-22, PageID.977.)

### C. The Ultimate Deal Between SPC and CSI

The final deal between SPC and CSI consists of three documents: the Lease, Purchase and Sale Agreement ("Purchase and Sale Agreement"); the Lease Agreement; and the Royalty Agreement.

On November 22, 2017, SPC and SCI executed the Purchase and Sale Agreement. (Purchase and Sale Agreement, ECF No. 1-2, PageID.52.)  Under this agreement, CSI purchased Parcel 2, received an option to purchase a portion of Parcel 1, and leased Parcels 3 and 4 on a non-exclusive basis.  (*See id.*; Lease Agreement, ECF No. 1-4.)  CSI agreed to pay $37 million, a portion of which was paid at closing with the remaining $22 million to be paid in three annual installments thereafter.  (*Id.*, PageID.26.)  SPC did not immediately notify Graymont of the Purchase and Sale Agreement because SPC believed that these renegotiated and final terms did not trigger Graymont's right of first refusal.  Moreover, CSI agreed to indemnify SPC against any claims by Graymont.  (*See* Indemnification Agreement, ECF No. 64-30.)

On November 30, 2017, SPC and CSI entered into the Lease Agreement.  (Lease Agreement, PageID.95.)  Under this agreement, CSI agreed to pay SPC an annual rent of $250,000 with a 2% annual increase for fifty years.  (*Id.*, PageID.96.)  The agreement also provided CSI with two options to extend the lease for an additional 25 years each.  (*Id.*)  The Lease Agreement enabled CSI to use the leased property to "mine, process, and ship sand."  (*Id.*, PageID.95.)

On January 30, 2018, SPC and CSI executed the Royalty Agreement.  (Royalty Agreement, ECF No. 1-5, PageID.122.)  This agreement requires CSI to pay SPC a royalty for each ton of proppant sand[5] extracted from the Brevort mine located on Parcel 2 and later sold.  (*See id.*)  After closing the transaction, the market for proppant sand weakened, and CSI could not make the annual

---

[5] Proppant sand is sand used in fracking.  (Canestraight Dep. 289.)

installment payments required by the Purchase and Sale Agreement.  (McKee Dep. 141.)  SPC agreed to relax the payment terms in exchange for a renegotiated Royalty Agreement.  (*See* 10/25/2018 Email Exchange Between SPC and CSI, ECF No. 67-4.)  The Amended Royalty Agreement provides for royalties that begin at a rate of $0.75 per ton of proppant sand and $0.35 per ton of all other sand mined on the Brevort property.  Both rates increase annually.  (Am. Royalty Agreement, ECF No. 1-6, PageID.129-30.)

### D. The Lease Dispute Between SPC and CSI

After a visit to the Brevort property in 2020, SPC noticed new material processing and handling equipment on site.  (6/8/2020 Email from Canestraight, ECF No. 67-5.)  CSI then informed SPC of its "Brevort Concrete Aggregate Production" plan.  Under this plan, CSI would purchase limestone from a nearby quarry, crush it, and send the crushed limestone to the Brevort property.  (Attachment to 6/9/2020 Email from LaPrairie, ECF No. 67-6, PageID.1117.)[6]  Once at the Brevort property, the crushed limestone would be washed, split into three sizes, and blended to produce the following Michigan Department of Transportation concrete aggregate types: 6AA Concrete Rock; 26A Concrete Rock; and 2NS Concrete Sand.  (*Id.*)  2NS Concrete Sand is a blend of 30% Brevort sand and 70% external sand.  (*Id.*)

A dispute arose between SPC and CSI as to whether the Lease Agreement allows for the Brevort Concrete Aggregate Production Plan.  According to SPC, the "Sand Rights" in Section 1.4 of the Lease Agreement only allow CSI to mine, process, and ship sand extracted from the Brevort mine.  Accordingly, SPC sought additional royalties for the portion of the Concrete Sand that is limestone as opposed to Brevort sand, but CSI declined to pay additional royalties.  (*See* June 2020 Email Exchange Between SPC and CSI, ECF No. 67-10; McKee Dep. 141, 144.)

---

[6] Cliff LaPrairie is CSI's President.

## II. PROCEDURAL HISTORY

CSI filed suit against SPC seeking a declaratory judgment that Section 1.4 of the Lease Agreement permits CSI to use the Brevort property to mine, process, and sell sand that includes the 2NS Concrete Sand detailed in the Brevort Concrete Aggregate Production Plan.  CSI also brings a breach of contract claim against SPC.  Graymont entered the lawsuit as an intervening plaintiff.  Graymont brings breach of contract claims against SPC and seeks specific performance as well as a declaratory judgment.

## III. STANDARD

### A. Subject Matter Jurisdiction

The standard for evaluating a Rule 12(b)(1) motion depends on the nature of the "attack" on subject matter jurisdiction.  A "facial attack" on subject matter jurisdiction "merely questions the sufficiency of the [complaint]."  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.3d 320, 325 (6th Cir. 1990).  Facial attacks are reviewed under the same standard as applied to a Rule 12(b)(6) motion: the Court accepts the plaintiff's well-pleaded allegations as true and asks whether subject matter jurisdiction exists based on the complaint.  *Id.*  No presumption of truth applies in a "factual attack" on subject matter jurisdiction.  *Id.*  Factual attacks challenge the actual existence of matters affecting jurisdiction.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  To resolve a factual attack, "'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case . . . . [T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'"  *Id.* (quoting *Mortensen v. First Fed. Sav. & Loans Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977)).  The plaintiff bears the burden of proof of jurisdiction when a factual attack is made.  *Id.*

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### IV. ANALYSIS

### A. SPC and CSI's Cross Motions

CSI filed a motion for summary judgment alleging it is entitled to the requested declaratory relief.  SPC filed a motion to dismiss CSI's request for declaratory relief for want of subject matter jurisdiction and for summary judgment on CSI's breach of contract claim.

#### 1. Declaratory Relief

CSI asks the Court to declare (1) that it has a right to process, store, and sell the 2NS Concrete Sand on the leased property; (2) that it is not required to pay royalties to SPC on the total weight of the 2NS Concrete Sand sold; (3) that SPC is only entitled to royalties on the portion of

the 2NS Concrete Sand that is mined on the Brevort property; and (4) that SPC shall refund to CSI any royalties paid from the sale of the 2NS Concrete Sand that exceeded the weight of the sand mined on the Brevort property.  (Compl. ¶ 52, ECF No. 1.)

### (a) Subject Matter Jurisdiction

SPC argues that the Court lacks subject matter jurisdiction to issue a declaratory judgment because there is no live case or controversy.  It argues that there is no live case or controversy because SPC only ever disputed CSI's attempt to expand its use of the Brevort property beyond sand to process and ship limestone aggregates.  According to SPC, it never denied CSI the opportunity to process and ship the 2NS Concrete Sand.  Therefore, because CSI "evades the underlying dispute rather than addresses it, there is no jurisdiction."  (Def. Reply Br. in Supp. of Mot. to Dismiss and for Summ. J., ECF No. 77, PageID.1745.)  SPC brings a factual attack on this Court's subject matter jurisdiction, meaning the Court may consider evidence outside the pleadings and need not treat the complaint as true.

"[T]he Declaratory Judgment Act provides that [a] district court, in a case of actual controversy 'may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'"  *Larry E. Parrish. P.C. v. Bennett*, 989 F.3d 452, 456 (6th Cir. 2021) (quoting 28 U.S.C. § 2201(a)).  "The Act does not 'change the essential requisites for the exercise of judicial power.'"  *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936)).  "All it does is create an alternative remedy—a declaratory judgment—for *existing* cases or controversies, a point confirmed by the Supreme Court's long equation of the Act's 'actual controversy' requirement with Article III's case-or-controversy imperative."  *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937)).

9

Accordingly, "'[t]o get a declaratory judgment, [the plaintiff] must present a justiciable case or controversy under Article III.'"  *Larry E. Parrish. P.C.*, 989 F.3d at 456 (quoting *Hemlock Semiconductor Corp. v. Kyocera Corp.*, 747 F. App'x 285, 292 (6th Cir. 2018)).  "That is, the plaintiff 'must demonstrate that the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Id.* at 456-57 (quoting *Hemlock Semiconductor Corp.*, 747 F. App'x at 292) (internal quotation marks omitted); *see also Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  "Therefore, a plaintiff must demonstrate 'an actual injury traceable to the defendant [that is] likely to be redressed by a favorable decision.'"  *Id.* at 457 (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

There is a substantial controversy between the parties as to whether the Lease Agreement allows CSI to process and ship the 2NS Concrete Sand.  In the email negotiations that followed CSI's delivery of its Concrete Aggregate Plan, SPC disputed CSI's right to use the leased Brevort property to ship limestone aggregates.  (*See* 6/18/2020 Email from Canestraight, ECF No 67-10, PageID.1169-70 ("What I'm interpreting differently [is] your right to utilize the Premises for business other than Sand Rights, which is the mining, processing, and shipping of sand . . . . Your proposal is to import and ship limestone.").)  But SPC also disputed CSI's right to process and ship the 2NS Concrete Sand under the Lease Agreement.  (*See* 6/7/2020 Email from Canestraight, ECF No. 71-11, PageID.1514 ("I agree that Sand Rights as defined in our lease is certainly the sand from the SPC site."); 6/15/2020 Email from Musselman, ECF No. 67-10, PageID.1171-72 ("We did not contemplate CSI would be shipping anything other than sand mined from the Brevort site when we entered the lease agreement."); 7/10/2020 Email from McKee, ECF No. 71-14,

PageID.1520) ("I do want to state that never did we anticipate or desire that you ship out anything other than sand from our pit.").)

There is also a substantial controversy as to whether SPC is entitled to royalties on the portion of the 2NS Concrete Sand that was not mined on the Brevort property.  SPC's President Chuck Canestraight told CSI that in order "to amend the Brevort lease authorizing receiving and shipping limestone products from the SPC Property [SPC would] need [CSI] to give strong consideration to the attached proposed royalty amendment and conditions." (7/3/2020 Email from Canestraight, ECF No. 71-13, PageID.1518.)  One such condition required SPC to pay royalties on "Brevort Sand blended with manufactured sand fines."  (2020 Proposed Modifications to Royalty Agreement, ECF No. 77-1, PageID.1756.)  CSI disputed this request because "[t]here is nowhere in the existing agreements that provide for new royalties . . . ."  (6/17/2020 Email from LaPrairie, ECF No. 67-10, PageID.1171.)  CSI also did not "understand the ask from SPC for additional compensation as the business cannot sustain additional costs beyond what is agreed." (*Id.*)  After a series of back-and-forth proposals, the negotiations failed.  SPC and CSI continued to disagree.

These substantial controversies are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  In other words, they are ripe for adjudication.  *See People Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998) ("[A] case is ripe for review only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (internal quotations and citations omitted)).  In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), Genetech sent MedImmune a letter indicating that it believed MedImmune was in breach of their agreement and requested royalties. *Id.* at 121-22.  MedImmune disagreed with Genetech's reading of the agreement but paid the

11

royalties anyways because it considered the letter to be a clear threat to terminate the agreement and sue for patent infringement.  *Id.*  The Supreme Court noted that "but for [the plaintiff's] continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution."[7]  *Id.* at 128.  In *Hemlock Semiconductor*, Hemlock had only "referenced its rights under the acceleration provisions [of the contract] and invoked them against different buyers in different circumstances."  747 F. App'x at 292.  The Sixth Circuit distinguished these facts from those in *MedImmune* because "Kyocera is not faced with paying them or facing suit."  *Id.* Accordingly, Kyocera's claim was unripe.  *Id.*  This case is more like *MedImmune* than *Hemlock*. Here, SPC notified CSI that it believed CSI was in breach of the Lease Agreement and requested to negotiate additional royalties.  CSI was faced with paying these royalties or remaining in breach under SPC's interpretation of the Lease Agreement.

When considering all the circumstances, the Court is satisfied that there is a substantial controversy between parties having adverse interests of sufficient immediacy to warrant the issuance of a declaratory judgment.  The Court has subject matter jurisdiction.

### (b) The Unclean Hands Doctrine

"The doctrine of unclean hands is an equitable concept that allows a court to deny injunctive or declaratory relief when 'the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.'"  *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, LLC*, 634 F. App'x 557, 567 (6th Cir. 2016) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995)).  "'In determining whether [a party] come[s] before this Court with clean hands,

---

[7] Although the plaintiff's own actions "eliminate[d] the imminent threat of harm," the Supreme Court still found that a case or controversy exists within the meaning of Article III.  *MedImmune*, 549 U.S. at 128-136.

the primary factor to be considered is whether [the party] sought to mislead or deceive the other party.'" *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316 (6th Cir. 2018) (quoting *Stachnik v. Winkel*, 230 N.W.2d 529, 534 (Mich. 1975)). SPC maintains that CSI breached the Lease Agreement by implementing its Concrete Aggregate Plan. According to SPC, there is "no reasonable basis" under the Lease Agreement that would allow CSI to process and ship products that are not sand. (Def.'s Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J., ECF No. 75, PageID.1614.)

However, CSI apparently believed that their Concrete Aggregate Plan was compliant with the terms of the Lease Agreement. CSI "believe[d] the $250,000 per year lease on the dock" allowed for the concrete aggregate plan to proceed "without further payment and provide[d] unlimited use on the asset." (6/17/2020 Email from LaPrairie, PageID.1171.) Cliff LaPrairie testified to this position:

> Q. Did you communicate to Sand Products, that you wanted to either purchase the processing parcel or retain the same rights as you would if you were an owner of it?
>
> A. Yes. And what we mean by "the same rights," is we want to, as if – as if we were the owner, have the rights of the owner from the sense of being able to freely operate the facility and freely make changes to the facility if we deemed that we need to from a processing perspective or efficiency perspective, and that we weren't interrupted in our ability to operate that facility.
>
> Q. Through the lease agreement that eventually was executed for the processing parcel and dock parcel, did you get the rights that you just described, the rights to freely operate, freely make changes, and not be interrupted in your business on that property?
>
> A. Yeah, sub -- yes, sub- -- subject to Graymont's access rights.

(LaPrairie Dep. 25-26, ECF No. 67-11.)[8]

The Sixth Circuit has stated that "[f]raud or unclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence." *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 371 (6th Cir. 1977) (quoting *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 392 (6th Cir. 1974)); *see also Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 784-85 (6th Cir. 2003); *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 714 (E.D. Mich. 2015). Regardless of whether the entire Concrete Aggregate Plan was or was not permissible under the Lease Agreement, SPC has not shown by unequivocal and convincing evidence that CSI intentionally sought to mislead or deceive SPC by instituting it. The Court declines to foreclose CSI's request for declaratory relief on the basis of unclean hands.

### (c) Merits

As an initial matter, the Purchase and Sale Agreement, the Lease, and the Royalty Agreement must be considered together when interpreting Section 1.4 of the Lease Agreement. Under Michigan law, the general rule is that separate agreements are treated separately. *See Beck v. Park West Galleries, Inc.*, 878 N.W.2d 804, 808 (Mich. 2016). "However, when parties enter into multiple agreements relating to the same subject-matter, [the Court] must read those agreements together to determine the parties' intentions." *Wyandotte Elec. Supply Co. v. Elec. Tech. Sys., Inc.*, 881 N.W.2d 95, 105 (Mich. 2016) (citing *Culver v. Castro*, 338 N.W.2d 232, 234 (Mich. 1983)). And "'where one writing refers to another, the two writings are to be construed together.'" *Smith Living Tr. v. Erickson Ret. Cmtys.*, 928 N.W.2d 227, 240 (Mich. Ct. App. 2018) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 605 n.27 (Mich. 1992)); *see also Culver*, 338 N.W.2d at 234.

---

[8] Excerpts of Cliff LaPrairie's deposition can be found at ECF Nos. 67-11 and 77-2.

The three agreements relate to the same subject matter and, thus, must be considered together.  In *Wyandotte Electric Supply Company*, the parties entered into an "open account" agreement that governed the defendant's purchases of materials and supplies from the plaintiff.  The parties later entered into a subsequent agreement concerning the provision of materials and supplies for the renovation of the Detroit Public Library.  The Michigan Supreme Court found that,

> although the initial open account agreement does not relate specifically to the library project, these agreements are directed to the same end—Wyandotte's provision of materials to ETS . . . . Together, these agreements demonstrate that Wyandotte and ETS intended to enter into an ongoing business relationship, and these agreements define the scope of that relationship.

*Id.* at 105.  In *Williams v. Sran*, No. 330615, 2017 WL 2562578 (Mich. Ct. App. June 13, 2017), the plaintiff and defendant entered into an oral lease and inventory agreement concerning a store. The Michigan Court of Appeals noted that,

> the lease agreement and the inventory agreement were not separate agreements at all; rather, they were different parts of *one* contemplated agreement, the primary "thrust" of which regarded the lease of the store.

*Id.* at *3 n.3.  Here, the Purchase and Sale Agreement, the Lease Agreement, and the Royalty Agreement together represent SPC and CSI's intention to enter into a business relationship and together define its scope.  After extensive negotiations, SPC and CSI decided to structure their business relationship in this particular way in light of Graymont's pre-existing rights under the Access Agreement.[9]  In other words, including a sale, a lease, and a royalty agreement in the same

---

[9] CSI initially offered to purchase "100% of the assets" of SPC.  (*See* CSI Initial Offer Letter.)  Recognizing the potential conflict with the Access Agreement between SPC and Graymont, SPC counteroffered and suggested a lease of Parcels 3 and 4 instead.  (*See* 4/3/2017 SPC Counteroffer; 5/1/2017 SPC Counteroffer; 4/2/2017 Email From Max McKee SPC CEO, ECF No. 64-13, PageID.943 ("I took a look and think we would be ok to structure our agreement with LaPrairie the way we currently are contemplating it and will not have to give Graymont any right to match.  But that was just my quick read.").)

transaction was no accident.  Moreover, the primary "thrust" of each agreement concerns the sale of SPC's business to CSI.

The three agreements also refer to one another.  The Purchase and Sale Agreement required CSI to deliver the Lease Agreement and the Royalty Agreement at closing.  (*See* Purchase and Sale Agreement, PageID.35-36.)  It also repeatedly references the Lease Agreement and the Royalty Agreement individually.[10]  The Royalty Agreement likewise mentions the Purchase and Sale Agreement:

> Simultaneously with the execution of this Agreement, SPC and CSI are closing on the transactions contemplated under the terms of a Lease, Purchase and Sale Agreement dated November 22, 2017 ("LPS Agreement") to which SPC and CSI are parties . . . .

(Royalty Agreement, PageID.1480.)[11]  Because the agreements reference one another, they must be considered together.

Now the Court turns to the interpretation of Section 1.4 of the lease.  "Under Michigan law, the proper interpretation of a contract is a question of law.'"  *Wolverine World Wide, Inc. v. Wolverine Canada, Inc.*, 653 F. Supp. 2d 747, 770 (W.D. Mich. 2009) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007)).  Accordingly, "[t]he question of whether

---

[10] "2.2  **Additional First Closing Matters.**  At the First Closing, CSI and SPC Group shall execute the following documents: (A) the real estate agreement for the Michigan Facility Leased property (the "Michigan Lease Agreement") in the form of <u>Exhibit H</u>, attached hereto and incorporated herein by reference; (B) the real estate lease agreement for the Michigan Mining Real Property (the "Michigan Mining Real Property Lease Agreement") in the form of <u>Exhibit I</u>, attached hereto and incorporated by reference."  (Purchase and Sale Agreement, PageID.25.)

" 6.1  **General Conditions Precedent.**  All obligations of CSI under this Agreement are subject to the fulfillment, or express waiver in writing signed by CSI, of each of the conditions precedent on or before the applicable closing:

> . . .

> (g)  SPC Group has executed a royalty agreement (the "Royalty Agreement") for proppant sand mined, processed, and transloaded from the Michigan Facility Leased Property and the Michigan Mining Real Property . . .

(*Id.*, PageID.33.)

[11] The Amended Royalty Agreement likewise references the other two agreements using similar language.  (Am. Royalty Agreement, PageID.129.)

a contract provision is clear or ambiguous is a question of law." *Id.* (citing *Port Huron Ed. Ass'n v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996)).

"'Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement.  When interpreting a contract, [the Court's] primary obligation is to give effect to the parties' intention at the time they entered into the contract.  To do so, [the Court] must examine the language of the contract according to its plain and ordinary meaning.'" *Cnty. of Ingham v. Mich. Cnty. Rd. Comm'n Self-Ins. Pool*, 975 N.W.2d 826, 834 (Mich. 2021) (quoting *Innovation Ventures v. Liquid Mfg*, 885 N.W.2d 861, 870 (Mich. 2016)). "A fundamental tenant of [Michigan's] jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced* as written." *Rory v. Cont'l Ins. Co*, 703 N.W.2d 23, 30 (Mich. 2004); *see also McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 817 (Mich. 2008) (affirming the same principle).

"'However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties.'" *Kendzierski v. Macomb Cnty.*, 931 N.W.2d 604, 612 (Mich. 2019) (quoting *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008)).  "'A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning.'" *Id.* (quoting *Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich.*, 892 N.W.2d 794, (Mich. 2017)).  And "it is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003) (citing *Hewett Grocery Co. v. Biddle Purchasing Co.*, 286 N.W.2d 221, 226 (Mich. 1939)).

Section 1.4 of the Lease Agreement reads:

**1.4**  The purpose of this Lease is to enable the Tenant [CSI] to access and use the Premises to mine, process, and ship sand (collectively, the "Sand Rights"). Tenant's Sand Rights are subject to Graymont's rights under the Access Agreement.

17

(Lease Agreement, PageID.95.)  Section 4.1 reinforces this purpose of the Lease Agreement:

> **4.1**  Tenant shall only use the Premises to exercise its Sand Rights and shall not use or allow the use of the Premises for any unlawful purpose, or in violation of any certificate or permit covering or affecting the Premises or any part thereof . . . .

(*Id.*, PageID.97.)

Section 1.4 of the Lease Agreement is ambiguous because it is equally susceptible to SPC and CSI's differing meanings.  On the one hand, CSI argues that nothing in Section 1.4 limits CSI to mining, processing, and shipping only sand extracted from the Brevort mine.  When considering the Lease Agreement and the Royalty Agreement together, this interpretation makes sense.  The Royalty Agreement expressly limited the royalties paid by CSI to sand extracted from the Brevort mine.[12]  Because Section 1.4 of the Lease Agreement did not impose that same limitation, the word "sand" can reasonably be interpreted to mean all sand, both Brevort-mined and non-Brevort mined.  On the other hand, Section 1.4 grants CSI the right to use the leased premises "to mine, process, and ship sand (collectively, the "**Sand Rights**")."  (Lease Agreement, PageID.95.)  Section 1.4 uses the conjunctive "and" rather than the disjunctive "or."  (*See Mich. Pub. Serv. Co. v. City of Cheboygan*, 37 N.W.2d 116, 129 (Mich. 1949) ("'And' is a conjunctive, used to denote a joinder, a union.  'Or' is the opposite, a disjunctive, used to indicate a disunion, a separation, an alternative.").  When considering the use of the conjunctive "and" in light of the Purchase and Sale Agreement, Brevort sand is the only sand that can be mined, processed, *and* shipped on the Brevort property.  The sand is mined on the property purchased by CSI under the Purchase and Sale

---

[12] The Amended Royalty Agreement did not change this aspect of the royalty payments:

> 2. **Royalty**.  CSI shall pay to SPC a royalty (the "Royalty") for all sand (not only proppant sand) extracted from the Michigan Mining Real Property.

(Am. Royalty Agreement, PageID.129.)

Agreement.  It is then processed and shipped on the property covered by the Lease Agreement. Because the meaning of Section 1.4 is equally susceptible to multiple meanings, it is ambiguous. There is a genuine dispute of material fact as to the meaning of Section 1.4.

### 2. Breach of Contract

"To recover for breach of contract under Michigan law, a plaintiff must allege: (1) the existence of a contract; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the breach caused the plaintiff's injury." *Derbabian v. Bank of America, N.A.*, 587 F. App'x 949, 953 (6th Cir. 2014) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).  CSI alleges that SPC breached the Lease Agreement:

> By its excessive royalty demand, and by asserting that the sale of the [2NS Concrete Sand] is an impermissible use of the Processing Parcel and Dock Parcel, Defendant has wrongfully sought to interfere with Plaintiff's operation of the Business.

(Compl. ¶ 57.)  At issue is whether these actions constitute a breach.[13]

First, SPC's assertion of its legal rights under the Lease Agreement and subsequent negotiations to amend the Royalty Agreement do not amount to a breach.  After learning of CSI's Concrete Aggregate Plan, SPC believed CSI was in breach of the Lease Agreement for implementing its Concrete Aggregate Plan.  SPC informed CSI that it believed CSI was in breach of the Lease Agreement.  The parties then engaged in subsequent negotiations to see if they could

---

[13] "[U]nder Michigan law a party 'who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.'"  *Jawad v. Hudson City Sav. Bank*, 636 F. App'x 319, 322 (6th Cir. 2016) (quoting *Ehlinger v. Bodi Lake Lumber Co.*, 36 N.W.2d 311, 316 (Mich. 1949)).  "A 'substantial breach' is one 'where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.'"  *Id.* (quoting *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964)).  In its response to CSI's motion for summary judgment on the declaratory relief requested, SPC cited the first breach doctrine.  (*See* Def.'s Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J., PageID.1612-13.)  However, SPC did not brief whether CSI's actions amounted to a substantial breach under Michigan law.  Moreover, SPC failed to raise this defense in its own motion for summary judgment as to the breach of contract claim.  Accordingly, the Court will not consider the first breach doctrine in its analysis of the breach of contract claim.

work something out by further amending the royalty structure.  This conduct alone does not amount to a breach by SPC, and CSI has neither cited case law suggesting the contrary nor pointed to any provisions in the Lease Agreement prohibiting SPC from asserting its rights.

To the extent that CSI is arguing SPC's conduct amounts to a breach of the covenant of quiet enjoyment, the Court disagrees.  Article 30 of the Lease Agreement expressly grants CSI the right to quiet enjoyment of the leased property:

> **30.1**  Subject to Graymont's rights and Landlord's obligations set forth in the Access Agreement, Landlord agrees that at all times when Tenant is not in default under the provisions and during the continuation of this Lease, Tenant's quiet and peaceable enjoyment of the Premises will not be disturbed or interfered with by Landlord or any third party claiming rights through Landlord.

(Lease Agreement, PageID.111.)  Although SPC and CSI expressly included a guarantee of quiet enjoyment, the common law principles of quiet enjoyment still apply.  *See Fitness Int'l, LLC v. Nat'l Retail Prop. Ltd. P'ship*, No. 358680, 2022 WL 7723954, at \*5 (Mich. Ct. App. Oct. 13, 2022).  "Generally, 'where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument.'"  *Id.* (quoting *In re Estate of Moukalled*, 714 N.W.2d 400, 408 (Mich. Ct. App. 2006)).  Under Michigan law, "the covenant of quiet enjoyment is breached only when the landlord obstructs, interferes with, or takes away from the tenant in *a substantial degree* the beneficial use of the leasehold."  *Slatterly v. Madiol*, 668 N.W.2d 154, 164 (Mich. Ct. App. 2003) (internal citations omitted).  Here, SPC sent emails inquiring about a use of the leased premises that it believed exceeded the scope of the Lease Agreement.  Then, the parties engaged in mutual negotiations over how to resolve the disagreement over the Concrete Aggregates Plan.  SPC did not exclude CSI from the leased premises, move CSI's equipment or make it inaccessible, or disrupt CSI's business relationships

20

with third party customers.  (*See* LaPrairie Dep. 199-201.)   Rather, SPC allowed CSI to continue

with the exact operations it believed were in breach of the Lease Agreement.  In November 2020,

months after the negotiations over additional royalty payments, SPC shipped the rock and sand

products outlined in its Concrete Aggregate Plan.  (*See* Bill of Lading for CSI's November 2020

Shipment of Concrete Aggregate Products, ECF No. 67-12, PageID.1188.)  And CSI has presented

no evidence that SPC prevented it from also continuing to process and ship sand from the Brevort

mine.  In short, CSI continued to enjoy the leased property "for the purpose for which the premises

are rented . . . ."  *Grinell Bros v. Asiuliewicz*, 21 N.W. 388, 389 (Mich. 1927).  CSI has failed to

demonstrate a genuine dispute of material fact as to whether SPC breached the Lease Agreement.

The Court will grant summary judgment to SPC on the breach of contract claim.

### B. SPC and Graymont's Cross Motions

Graymont alleges SPC breached Sections 2, 14, 31, 35, and 42 of the Access Agreement.

Graymont and SPC filed cross motions for summary judgment on all the alleged breaches.

#### 1. Laches

SPC first argues that it is entitled to summary judgment on all of the alleged breaches

because Graymont's claims are barred by the doctrine of laches.  The Michigan Supreme Court

has historically dismissed laches defenses where the claim was brought within the statute of

limitations period.  *See, e.g.*, *Mich. Educ. Emps. Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 152

(Mich. 1999) ("[B]ecause [the plaintiff] filed this case within the six-year period of limitation, any

delay in the filing of the complaint was presumptively reasonable, and the doctrine of laches is

simply inapplicable.").  More recently, however, the Michigan Court of Appeals held that the

doctrine of laches is applicable even when the statute of limitations has not expired.  *See, e.g.*,

*Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 864 (Mich. Ct. App. 2008) ("The

application of laches can shorten, but never lengthen, the analogous period of limitations . . . .

Thus, laches may bar a legal claim even if the statutory period of limitations has not yet expired.").

Accordingly, although Graymont filed its complaint within the applicable statute of limitations

period, SPC may still raise a defense based on the doctrine of laches.

> Under Michigan law, the doctrine of laches
>
> is triggered by the plaintiff's failure to do something that should have been done under the circumstances or failure to claim or enforce a right at the proper time. However, the doctrine is only applicable in cases in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party.

*Dep't of Envtl. Quality v. Gomez*, 896 N.W.2d 39, 53 (Mich. Ct. App. 2016) (citations and internal

quotation marks omitted).  "It is the prejudice occasioned by the delay that justifies the application

of laches."  *Knight v. Northepointe Bank*, 832 N.W.2d 439, 442 (Mich. Ct. App. 2013) (citing

*Dunn v. Minnema*, 36 N.W.2d 182, 185 (1949) ("This Court has repeatedly held that mere delay

in attempting to enforce a right does not constitute laches, but that it must further appear that the

delay resulted in prejudice to the party claiming laches of such character as to render it inequitable

to enforce the right.")).  "'The prejudice necessary to establish a laches or estoppel defense cannot

be a *de minimis* harm;' rather, the party asserting the defense 'must show that he or she made such

a substantial change in position or incurred such extensive obligations and expenses that it would

be highly inequitable and unjust to destroy the rights which he or she ostensibly had acquired.'"

*John E. Freudenberger Revocable Living Tr. by Freudenberger v. Irish Boat Shop, Inc.*, No.

358793, 2022 WL 4281802, at *2 (Mich. Ct. App. Sept. 15, 2022) (quoting *Lyon Charter Twp. v.

Petty*, 896 N.W.2d 477, 482 (Mich. Ct. App. 2016)).

SPC has not identified prejudice that would justify the application of the doctrine of laches.

As evidence of prejudice, SPC argues that Graymont's delay threatens SPC's ability to receive

repayment from CSI in accordance with the Purchase and Sale Agreement, Lease Agreement, and

Royalty Agreement.  However, this is not prejudice caused by Graymont's delay.  This threat existed the moment SPC executed its transaction with CSI.  And SPC's restructuring of its payment and royalty terms with CSI does not constitute a substantial change in position or an extensive expense; it merely redefined the terms of how CSI would pay SPC.  (*See* Am. Royalty Agreement.) SPC recognized the potential threat Graymont posed to its transaction with CSI even before finalizing it.  In order to protect itself, SPC entered into an indemnification agreement with CSI in 2017 whereby CSI would indemnify SPC against any claims by Graymont:

> Q.  Okay.  And did you eventually form an indemnification agreement with CSI with regard to Graymont's right of first refusal?
>
> A.  I wouldn't say we formed it.  We accepted an indemnification agreement proposal, and it suited our concern.  I believe we did do a structure that did not trigger the right of first refusal but didn't go to that level of concern because of the indemnification --
>
> Q.  Okay.
>
> A. -- that was provided.
>
> Q.  Okay.  So whatever concern you might have about the right of first refusal, the indemnification agreement, from Sand Products' perspective, made it tenable to move forward with the transaction; is that fair to say?
>
> A.  Yes.

(Canestraight Dep. 128; *see also* Indemnification Agreement.)  In short, any resulting harm or prejudice to SPC was not caused by Graymont's delay.  Graymont's complaint is not barred by the doctrine of laches.

### 2. Failure to Join a Necessary Party

Graymont intervened as a plaintiff in this lawsuit filed by CSI against SPC.  Graymont sued SPC for breach of contract.  SPC argues that the Court may not proceed to the merits of Graymont's claims because Graymont has not joined CSI, a necessary party, as a defendant.

Rule 19 of the Federal Rules of Civil Procedure requires necessary persons be joined as parties in an action.  Fed. R. Civ. P. 19.  "Rule 19 is designed to protect the interests of absent persons as well as those already before the court from multiple litigation or inconsistent judicial determinations."  7 Wright & Miller, Federal Rules of Practice and Procedure §1062 at 18.  Rule 19 states that "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as *a party* . . ."  Fed. R. Civ. P. 19(a)(1) (emphasis added).  CSI is already a party in this action, it is the plaintiff.  As the plaintiff, CSI "was involved in discovery of Graymont's claims, has been served with all of Graymont's discovery, and examined Graymont's witnesses."  (Graymont's Resp. in Opp. to Def.'s Mot. for Summ. J., ECF No. 73, PageID.1570.)  Because CSI is a party to the litigation, the Court will proceed to address the merits of Graymont's claims.

### 3. Breach of the Right of First Refusal

Section 31(a) of the Access Agreement grants Graymont a right of first refusal as to the Brevort property:

> If SPC obtains a bona fide offer to purchase some or all of the SPC Facility, or all or substantially all of the SPC Property, that is acceptable to it, SPC will deliver to Graymont a written notice (i) stating its intention to transfer the SPC Facility or SPC Property, and (ii) including a copy of the bona fide offer for purchase. Graymont will have the right of first refusal (the "Right of First Refusal") for a period of sixty (60) days after receiving the notice to elect to purchase the offered property upon the same price, terms and conditions of the sale as are contained in SPC's notice.  Graymont will exercise the Right of First Refusal by delivering notice to SPC during the exercise period permitted above.  If Graymont does not exercise the Right of First Refusal, then SPC may close the transaction in accordance with the provisions of the offer, subject to this Agreement.  If SPC does not close under the offer within six (6) months after the exercise period has expired, then this Right of First Refusal will continue as to any subsequent proposed sales of the SPC Facility or SPC Property.  The Right of First Refusal will terminate as to any portion of the SPC Property transferred by SPC hereunder if the transfer was undertaken in compliance with these provisions.

(Access Agreement, PageID.364.)

24

"A right of first refusal [] creates no interest in land." *Redding v. Blodgett*, No. 349573, 2021 WL 1236110, at *4 (Mich. Ct. App. Apr. 1, 2021) (quoting *Randolph v. Reisig*, 727 N.W.2d 388, 392 (Mich. Ct. App. 2006)).  Rather, "'[a] right of first refusal, or preemptive right, is a conditional option to purchase dependent on the landowner's desire to sell.'" *Id.* (citing *Randolph*, 727 N.W.2d at 391).  At issue is whether the Lease Agreement between SPC and CSI constitutes a "bona fide offer to purchase some or all of the SPC Facility" such that it triggered Graymont's right of first refusal.  (Access Agreement, PageID.364.)

Graymont argues that the standard articulated by the Michigan Court of Appeals *LaRose Market, Inc. v. Sylvan Center, Inc.*, 530 N.W.2d 505 (Mich. Ct. App. 1995) applies to this case. In *LaRose*, the plaintiff leased property from the defendant to operate a supermarket.  The lease granted the plaintiff a right of first refusal to purchase the property:

> Landlord agrees to offer to tenant right of first refusal of any bona fide offer to purchase premises described herein during the term of lease and further provided Tenant exercises option to purchase within ten (10) days from date of notification from Landlord of said offer to purchase, under the same terms and conditions and with payment of the same security deposit as provided in said offer.

*Id.* at 507.  The Michigan Court of Appeals was required to decide "whether the sale of all of a corporate lessor's stock constitutes a 'sale' of the corporation's real property triggering a lessee's right of first refusal to purchase the demised property."  *Id.*  The court adopted the definition of a "sale" previously articulated by the Utah Supreme Court:

> for purposes of a right of first refusal a "sale" occurs upon the transfer (a) for value of a significant interest in the subject property (c) to a stranger to the lease, (d) who thereby gains substantial control over the leased property.

*Id.* at 509 (quoting *Prince v. Elm Inv. Co., Inc.*, 649 P.2d 820, 823 (Utah 1982)).  *LaRose* also found

> that where a sale of property occurs between an individual and a corporation, rather than a mere corporate stock transfer, equitable considerations such as the parties' motives for the sale and the relationship between the parties become relevant.

*LaRose*, 530 N.W.2d at 509.

However, the facts of both *Prince* and *LaRose* are distinguishable from the facts in this case.  In *Prince*, the plaintiff also leased property from the defendant and held a right of first refusal.[14]  The defendant entered into a partnership agreement with a third party to acquire, improve, lease, and manage the plaintiff's property.  Under the agreement, the defendant owned fifty-one percent and the third party owned forty-nine percent of the partnership.  *Prince*, 649 P.2d at 821.  In *LaRose*, the Michigan Court of Appeals was concerned with whether a sale of stock constitutes a sale sufficient to trigger the plaintiff's right of first refusal.  *LaRose*, 530 N.W.2d at 507.  Importantly, the plaintiff asserted that the stock sale was part of a prearranged plan to circumvent its right of first refusal.  "The second step, presumably, would involve a conveyance of the demised property."  *Id.* at 509.  The court found that the mere change in identity of the corporate shareholders, with no injury to the plaintiff, did not trigger the right of first refusal.  *Id.* at 509.  Both *Prince* and *LaRose* involved a sale of some asset or ownership interest.  *See also Victory Lane Quick Oil Change, Inc. v. Hoss*, No. 00-cv-73104-DT, 2001 WL 1219152, at *8-9 (E.D. Mich. Sept. 28, 2001) (applying *Prince* and *LaRose* to find that the defendant's agreement with a third party which transferred ownership of a business pursuant to an oral agreement of partial gift and partial sale triggered the plaintiff's right of first refusal).  Here, Graymont asks the Court to apply the principle articulated in *Prince* and *LaRose* to a lease.  The Court declines to do so.

---

[14] The right of first refusal in the lease agreement read:

> TENTH: Tenant shall have the first right of refusal to purchase this property and adjacent properties owned by Elm Investment Co., Inc., if said property are offered for sale during the term of this Lease . . . .

*Prince*, 649 P.2d at 821.

Here, general principles of contract interpretation apply. Under Michigan law "[u]nambiguous contractual language must be enforced as written, but if the language is ambiguous, the parties' intentions may be discerned by resort to extrinsic evidence. *Redding*, 2021 WL 1236110, at *4 (quoting *In re Smith Trust* (*Smith II*), 745 N.W.2d 754, 757-58 (Mich. 2008)). "'It thus becomes apparent that each case depends on the wording of the provision relied upon, and the circumstances of the case.'" *Id.* (quoting *Laevin v. St. Vincent De Paul Soc. of Grand Rapids*, 36 N.W.2d 163, 165 (Mich. 1949)). "Nevertheless, in the event judicial construction is appropriate in a particular case, rights of first refusal should be construed narrowly and in such a way as to maximize the free use of the property." *Id.* (citing *Moore v. Kimball*, 289 N.W. 213, 215 (Mich. 1939)); *LaRose*, 530 N.W.2d at 507); *see also Evans v. SC Southfield Twelve Assocs., LLC*, 208 F. App'x 403, 407 (6th Cir. 2006) (citing *LaRose*).

"While 'purchase' is not defined in the [Access Agreement], the term is defined in Black's Law Dictionary (7th ed.) as 'the act or an instance of buying,' and 'the acquisition of real property by one's own or another's act (as by will or gift) rather than by descent or inheritance." *Commc'n Enhancement, LLC v. T6 Unison Site Mgmt., LLC*, No. 303657, 2012 WL 1890108, at *4 (Mich. Ct. App. May 22, 2012). In *Communication Enhancement*, the Michigan Court of Appeals considered whether an easement triggered a right of first refusal.[15] The court emphasized that "[a]n easement is the right to use the land of another for a specified purpose . . . . An easement does not displace the general possession of the land by its owner, but merely grants the holder of the

---

[15] The right of first refusal in the lease agreement read,

> It is understood and agreed by the parties hereto that in the event Lessor receives an offer to purchase the Property, Premises Site or Lessor's Property . . . at any time during the Option Period . . . Lessor shall, prior to selling its interest in the Sale Property, first communicate said offer to Lessee . . . within seven (7) days from the date of receipt of said offer. Lessee shall have fifteen (15) days from the date of receipt of said notice to match the purchase price offered to Lessor

*Commc'n Enhancement*, 2012 WL 1890108, at *4.

easement qualified possession only to the extent necessary for enjoyment of the rights conferred by the easement." *Id.* (internal citations omitted).  Accordingly, "[a]n easement [] is not the *acquisition* or *buying* of real property, but merely the right to *use* of another's real property.  The distinction is significant." *Id.*  The Michigan Court of Appeals found that an offer to purchase an easement was not an offer to purchase the property and thus did not trigger the plaintiff's right of first refusal.  *Id.*  Like an easement, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration."  Lease, Black's Law Dictionary (11th ed. 2019).  The Lease Agreement granted CSI a right "to access and use the Premises to mine, process, and ship sand (collectively, the "Sand Rights")."  (Lease Agreement, PageID.95.)  SPC also retained rights to use the property itself.  It

> reserve[d] the right to enter and utilize the Premises so that it may use the Dock Area, fulfill its obligations under the Access Agreement, and operate the Vessel Loading Equipment for Graymont's benefit and for the Landlord's own benefit; provided that, under no circumstances shall Landlord's use of the Sand Property, Vessel Loading Equipment or Dock Area for Landlord's own benefit (and not for Graymont's benefit) interfere with Tenant's rights under this Lease.

(*Id.*, PageID.113.)  Accordingly, a lease of the SPC Facility is not a purchase of the SPC Facility that triggered Graymont's right of first refusal.

Graymont argues that the right of first refusal provision in the Access Agreement is ambiguous as written because it uses the words "purchase" *and* "transfer."  So, even if the lease cannot be construed as a "purchase," it can be construed as a "transfer."  Black's Law Dictionary defines the word transfer as "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance."  Transfer, Black's Law Dictionary (11th ed. 2019).  However, the plain language of the provision cannot be read to suggest that a transfer would trigger the right of first refusal.  The provision plainly requires a "bona fide offer to purchase."  Upon receiving such a bona fide

offer to purchase, "SPC will deliver to Graymont a written notice (i) stating its intention to transfer the SPC Facility or SPC Property and (ii) including a copy of the bona fide offer for purchase." (Access Agreement, PageID.364.)  The use of the conjunctive "and" rather than the disjunctive "or" indicates that SPC must provide notice of its intention to part with the property via a bona fide offer to purchase.  The right of first refusal provision concludes by stating that the right "will terminate as to any portion of the SPC Property transferred by SPC hereunder if the transfer was undertaken in compliance with these provisions."  (*Id.*)  Here too, a transfer under the right of first refusal still requires a bona fide offer to purchase to comply with the provision.  The use of the word "transfer" in these contexts is insufficient to create an ambiguity.

The Court's interpretation of the right of first refusal is further supported by Graymont's own representations.  In May of 2017, SPC provided Graymont with a copy of the Letter of Intent executed between SPC and CSI and stated:

> Let this email serve as our official notice of SPC's intention to transfer property to which Graymont has a Right of First Refusal on the terms outlined in the attached letter of intent.

(5/7/2017 Email from Musselman.)  The terms in the Letter of Intent were different from those in the Purchase and Sale Agreement.  Under the Letter of Intent, CSI would purchase Parcels 1 and 2 and lease Parcels 3 and 4.  Under the Purchase and Sale Agreement, CSI would purchase Parcel 2, hold an option to purchase Parcel 1, and lease Parcels 3 and 4.  Regardless, the Letter of Intent put Graymont on notice that a lease and a purchase were part of the transaction between SPC and CSI.  Graymont responded that it did not believe the Letter of Intent began the 60-day right of first refusal period because it was not a "bona fide offer for purchase."  (Kehler Dep. 92-93.)  Thus, Graymont itself appears to have acknowledged that a bona fide offer for purchase, rather than a transfer, is required to trigger the right of first refusal.

In sum, the right of first refusal provision is unambiguous.  Graymont's right of first refusal is triggered "[i]f SPC obtains a bona fide offer to purchase some or all of the SPC Facility, or all or substantially all of the SPC Property."   (Access Agreement, PageID.364.)   The Lease Agreement between SPC and CSI is not a bona fide offer to purchase as described in Section 31(a) of the Access Agreement.  Accordingly, SPC did not breach the right of first refusal.  The Court will grant summary judgment in favor of SPC on this claim.

### 4. Breach of Other Provisions in the Access Agreement

"To recover for breach of contract under Michigan law, a plaintiff must allege: (1) the existence of a contract; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the breach caused the plaintiff's injury." *Derbabian*, 587 F. App'x at 953.  At issue is whether SPC's actions in entering into the Lease Agreement with Graymont breached other provisions in the Access Agreement.

### (a) Graymont's Non-Exclusive Right to Use the SPC Facility

Sections 2 and 42 of the Access Agreement concern Graymont's rights to use the SPC Facility.  Section 2 reads:

> 2.   Grant of Rights.   Beginning on the Commencement Date, SPC grants to Graymont the non-exclusive right to use the SPC Facility with SPC, as described in Section 3 below.

(Access Agreement, PageID.351.)[16]  Section 42 reads:

> 42.   Quiet Enjoyment.   SPC covenants that Graymont, on payment of all the payments and performance of all the covenants aforesaid, may peacefully and

---

[16] Section 3 of the Access Agreement reads:

> Subject to the other terms and conditions of this Agreement, Graymont will access the SPC Facility solely to facilitate storage, handling and shipping of Lime Materials and for such other purposes which are incidental and customary thereto.  Graymont may not access the SPC Facility for any other purpose except upon SPC's written approval, which approval will not be unreasonably withheld, delayed or conditioned  . . . .

(Access Agreement, PageID.351.)

quietly have, hold and enjoy the SPC Facility for the Term on a non-exclusive basis with SPC on the terms and conditions set forth herein.

(*Id.*, PageID.367.)

Graymont argues that SPC breached Sections 2 and 42 of the Access Agreement by executing the Lease Agreement with CSI because these sections were intended to ensure that Graymont has the right to use the SPC Facility only with SPC, not with any other party.  The Court disagrees.  Under the Lease Agreement between SPC and CSI, Graymont still maintained a non-exclusive right to use the SPC Facility.  SPC also retained the right to utilize the leased property to fulfill its obligations to Graymont under the Access Agreement and operate the equipment for both Graymont and it's own benefit.  (*See* Lease Agreement, PageID.113.)  So, Graymont still uses the SPC Facility on a non-exclusive basis with SPC.  Nothing in Sections 2 or 42 creates a limitation that third parties may not use the SPC Facility on a non-exclusive basis with SPC and CSI.  Indeed, it appears the Access Agreement anticipated third parties would be using the SPC Facility:

> (d)  For each forecasted Loading Event, Graymont will have priority over any third party, including with respect to material owned by any party other than SPC, regarding the use of the Dock Area and the SPC Facility for the performance of the Services.

(Access Agreement, PageID.352.)  Accordingly, the Court will not read such a limitation into Sections 2 and 42 of the Access Agreement.  "Plain and unambiguous contract language cannot be rewritten by the Court 'under the guise of interpretation,' as the parties must live by the words of their agreement."  *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007) (quoting *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 397 (Mich. 1991)).  Certainly, language expressly prohibiting third parties from also using the SPC Facility on a non-exclusive basis "could have been included by the parties, but it was not."  *Id.* at 589.

31

SPC also did not breach Section 42 by entering into the Lease Agreement with CSI.  Under Michigan law, "the covenant of quiet enjoyment is breached only when the landlord obstructs, interferes with, or takes away from the tenant in *a substantial degree* the beneficial use of the leasehold."  *Slatterly v. Madiol*, 668 N.W.2d 154, 164 (Mich. Ct. App. 2003) (internal citations omitted).  SPC's decision to enter into the Lease Agreement has not denied Graymont a substantial degree of the beneficial use of the SPC Facility.  Paul Stoll, Graymont's on-site manager, testified that Graymont and CSI have had a smooth working relationship:

> Q.  All right.  Have there been any issues at all for Graymont, from Graymont's perspective, working with CSI at the Brevort Facility?
>
> A.  No.  I think that we have had a good working relationship with CSI.  We've – we've had some concerns over activities at the dock with -- with respect to whether they are in position with our equipment.  But, I mean, overall, it's all right.

(Stoll Graymont Dep., 93 ECF No. 69-5.)[17]  The record evidence does not suggest that SPC's lease agreement with CSI has deprived Graymont of a substantial degree of its beneficial use of Brevort property.  In sum, SPC has not breached Sections 2 and 42 of the Access Agreement.  The Court will grant summary judgment in favor of SPC on this claim.

### (b) SPC's Provision of Services to Graymont

In Section 35 of the Access Agreement, SPC provided Graymont with a list of express representations and warranties.  Under Section 35(iv), SPC represented that

> SPC has the authority and resources necessary to perform the Services under this Agreement safely, on time and in accordance with the terms of this Agreement, subject to all applicable regulatory approvals . . .

(Access Agreement, PageID.336.)  The Services referred to are outlined in Section 5 of the Access Agreement:

> 5.  Services.  SPC and Graymont each intend to ship products from the Dock Area. Subject to the terms of this Agreement, SPC agrees to use reasonable commercial

---

[17] Excerpts of the deposition of Paul Stoll, Graymont's on-site manager, can be found at ECF Nos. 64-21 and 69-5.

efforts to perform all tasks required to transfer, store, and load the Lime Materials at and from the SPC Property during the Term . . .

(Id., PageID.351.)  In Section 5(i), SPC represented that it

will not subcontract any material portion of the Services without Graymont's prior written approval, which may be withheld in Graymont's sole and exclusive discretion.  Graymont will have the right during the Term to revoke its approval of a subcontractor.  Notwithstanding the terms of any subcontract, the approval of a subcontractor by Graymont or the availability or unavailability of subcontractor insurance, SPC will be and remain responsible and liable for all actions of any subcontractor and its personnel, including their failure to perform according to this Agreement or to comply with any duties or obligations imposed on SPC under this Agreement to the same extent as if the action or failure to perform or comply was committed by SPC.

(*Id.*, PageID.352.)  And in Section 14, SPC and Graymont agreed that

[n]either party will assign or in any way transfer this Agreement or any part hereof without the prior written consent of the other party, not to be unreasonably withheld, conditioned or delayed.

(*Id.*, PageID.358.)  Graymont argues SPC breached the representation and warranty in Section 35(iv) because SPC currently lacks adequate resources itself to provide the required services to Graymont and impermissibly used CSI's resources to provide them in the past.

Since the Access Agreement took effect in 2014, Graymont has conducted two series of test shipments—once in November of 2018 and again in October of 2019.  (Stoll Dep. 45-46.)  After executing the Lease Agreement, former SPC employees were hired by CSI, and SPC no longer maintained any of its own employees at Brevort.  (Musselman Dep. 80.)  Instead, SPC enlisted two CSI personnel to assist Graymont with the shipments.  (Stoll Dep. 48.)  It appears that Graymont has not conducted any shipments since 2019.

At issue is whether SPC breached the Access Agreement by paying CSI personnel to perform the services required under Section 35(iv).  SPC argues that it did not assign or subcontract its duty to provide Graymont with services, rather it merely "utilized" CSI's personnel. (Canestraight Dep. 201.)  To "assign" means "to convey in full; to transfer (rights or property)."

Assign, Black's Law Dictionary (11th ed. 2019).  SPC did not assign its duty to provide services to Graymont.  Under the Lease Agreement between SPC and CSI, SPC specifically retained the right to continue to utilize the property to fulfil its obligations to Graymont under the Access Agreement.  (*See* Lease Agreement, PageID.113.)  However, SPC did subcontract its duty to provide services to Graymont.  A "subcontract" is "a contract between a party to an original contract and a third party" especially "one to provide all or a specified part of the work or materials required in the original contract."   Subcontract, Merriam-Webster Dictionary.com, https://www.merriam-webster.com/dictionary/subcontract.  SPC agreed to a time and material (T&M) arrangement with CSI to use its personnel for the test shipments, and CSI sent an invoice to SPC.  (Canestraight Dep. 200.)  CSI originally wrote the invoice out to Graymont, but SPC requested that CSI send the invoice to them instead because SPC "wanted to see it on SPC letterhead" before passing it along to Graymont.  (*Id.*)  Accordingly, SPC subcontracted the services out to CSI.  SPC has failed to demonstrate that it obtained Graymont's prior written approval before hiring the CSI workers.  Accordingly, SPC did not perform the services in accordance with Section 5(i) of the Access Agreement.

Graymont argues SPC is also in breach of Section 35(iv) because SPC no longer has the "resources necessary to perform the Services . . . safely, on time and in accordance with the terms" of the Access Agreement.  (Access Agreement, PageID.366.)  SPC has made clear it is no longer involved in the sand business in Michigan. (Canestraight Dep. 336-37.)  Moreover, it was CSI not SPC personnel that performed the services on Graymont's previous shipments.  However, SPC argues that "there is no basis for Graymont to insist that Sand Products employ personnel to sit idly in Brevort with nothing to do, particularly when it has been more than three years since

Graymont shipped anything." (Def.'s Mot. for Summ. J. as to Compl. of Intervening Pl., ECF No

68, PageID.1229.) Rather, SPC represents that

> [i]f and when Graymont plans to use the SPC Facility, Sand Products is ready, willing, and able to deploy personnel to Brevort, Michigan to provide the services called for under the Access Agreement, so long as Graymont provides advance notice of its shipping schedule as required.

(Canestraight Decl., ECF No.76-2, PageID.1680.) Graymont anticipates that it will start shipments

again in 2022 with a maximum of four test vessels. (Stoll Dep. 47, 49.) Accordingly, there is a

genuine dispute of material fact as to whether SPC has the "resources" necessary to provide the

services to Graymont "safely, on time and in accordance with the terms" of the Access Agreement.

(Access Agreement, PageID.366.)

### (c) No-Assignment Provision

Section 14 of the Access Agreement governs the parties' rights with respect to assignment.

Under Section 14,

> [n]either party will assign or in any way transfer this Agreement or any part thereof without the prior written consent of the other party, not to be unreasonably withheld, conditioned or delayed . . . . In the event that SPC sells or otherwise assigns or transfers the SPC Property, the transfer will be subject to all terms of this Agreement and SPC will require the transferee to assume the obligations of SPC under this Agreement.

(*Id.*, PageID.358.) As previously mentioned, under the Lease Agreement, SPC specifically

retained the right to use the premises to fulfill its obligations to Graymont. (*See* Lease Agreement,

PageID.113.) SPC did not assign or otherwise transfer any portion of the Access Agreement to

CSI, so it was not required to seek Graymont's prior written consent under Section 14. However,

SPC did assign or otherwise transfer the SPC Property to CSI. A transfer includes a lease. *See*

Transfer, Black's Law Dictionary (11th ed. 2019). SPC leased Parcels 3 and 4 of the SPC Property

to CSI. SPC ensured that the Lease Agreement was subject to all terms of the Access Agreement.

(*See, e.g.*, Lease Agreement, PageID.114. ("Tenant's use of the leased Premises shall be subject

and subordinate to the rights of Graymont as established and set forth in the Access Agreement.").) However, the Access Agreement not only requires that the Lease Agreement be subject to its terms but also that SPC require CSI to assume its obligations.  CSI did not assume the obligations of SPC; rather, SPC retained its obligations under the Access Agreement.  Accordingly, by entering into the Lease Agreement but not requiring CSI to assume its own obligations, SPC breached Section 14 of the Access Agreement.  The Court will grant summary judgment to Graymont on this claim.

## V. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part SPC and CSI's cross motions.  The Court will deny SPC's motion to dismiss CSI's request for declaratory relief on the basis of subject matter jurisdiction.  The Court will also deny CSI's motion for partial summary judgment on the requested declaratory relief.  The Court will grant SPC's motion for summary judgment on the breach of contract claim.

The Court will also grant in part and deny in part SPC and Graymont's cross motions.  The Court will grant summary judgment to SPC on Count I for breach of the right of first refusal under Section 31(a) of the Access Agreement and on Count III for breach of Sections 2 and 42 of the Access Agreement.  The Court will grant summary judgment to Graymont on Count II for breach of Section 14 of the Access Agreement.  The Court will grant summary judgment to Graymont on Count IV for breach of Section 35(iv) of the Access Agreement as it relates to SPC's previous hiring of CSI workers to perform the services required under the Access Agreement.  However,

there is a genuine dispute of material fact as to whether SPC also breached Section 35(iv) of the Access Agreement by not currently having the resources necessary to provide the services required under the Access Agreement.


Dated: November 26, 2022                          /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE