UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANADIAN SILICA INDUSTRIES, INC.,

      Plaintiff,

                                        Case No. 1:20-cv-1229

v.

                                        Hon. Hala Y. Jarbou

SAND PRODUCTS CORPORATION,

      Defendant.
_____

GRAYMONT LLC,

      Intervening Plaintiff,

v.

SAND PRODUCTS CORPORATION,

      Defendant.
_____

## **OPINION**

Plaintiff Canadian Silica Industries, Inc. ("CSI") brings this action under diversity jurisdiction against Defendant Sand Products Corporation ("SPC"). CSI seeks declaratory relief with respect to its rights and obligations under a lease agreement between the two parties. On January 25, 2023, the Court held a bench trial on the matter. This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

# I. FINDINGS OF FACT

Prior to 2017, SPC owned and operated a sand business in Brevort, Michigan.  (Stip. Fact A, ECF No. 127, PageID.2415.)[1]  The sand business included approximately 1,500 acres of land divided into four parcels.  (Survey, Def.'s Ex. A.)  SPC mined the sand from its natural state on Parcels 2 and 3, which are located north of U.S. Highway 2.  (Tr. I, 210-211, ECF No. 135.)[2]  It then transported the sand by conveyor under U.S. Highway 2 to Parcel 4 for processing and then shipment by vessel from a dock.  (*Id.* at 207, 211.)  The sand business also included shipping terminals along Lake Erie in Buffalo, New York and Cleveland, Ohio, where the shipped sand could be dried, stored, and ultimately distributed to purchasers.  (*Id.* at 218.) SPC historically produced two types of sand, one of which was frac sand.  Frac sand is commonly used in the fracking industry.  Proppant sand is another term for frac sand.  (*Id.* at 47.)

## A. SPC and CSI's Negotiations

In 2017, SPC began to look for a potential buyer of its sand business.  SPC saw the frac sand market taking off and believed that a larger, more experienced company like CSI could capitalize on this opportunity while also being able to endure the market's volatility.  (Tr. II, 24-25, ECF No. 136.)[3]  It expected CSI to "utilize the sand business in the same line of production and logistics and distribution with those value[-]added principles that [CSI] had described as to why they were a fully integrated and wise choice to help expand the sales out of [the Brevort] mine."  (Tr. I, 171.)

---

[1] The parties have stipulated to a list of facts in their proposed final pretrial order (ECF No. 127).  During the bench trial, the Court placed the stipulations on the record.

[2] "Tr. I" refers to the first volume of the trial transcript, located at ECF No. 135.

[3] "Tr. II" refers to the second volume of the trial transcript, located at ECF No. 136.

CSI, a Canadian corporation, expressed interest in purchasing SPC's sand business to expand its geographic footprint into Michigan, Ohio, Pennsylvania, New York, and West Virginia. (*Id.* at 27.)  CSI further believed that SPC's sand business was capable of higher production levels and was not being fully utilized to enter all the available markets.  (*Id.* at 27-28.)  Prior to its acquisition of the sand business, CSI sold a variety of sands including, but not limited to, concrete sand, asphalt sand, filtration sand, foundry sand, and frac sand.  (*Id.* at 14-15.)

So, the parties began their negotiations.  Cliff LaPrairie, the President and Chief Operating Officer, spearheaded the negotiations on behalf of CSI.  (*See id.* at 13.)  Chuck Canestraight, the President, Max McKee, the Chief Executive Officer, and Scott Musselman, the Chief Financial Officer each partook in the negotiations to varying degrees on behalf of SPC.  (*See id.* at 140; Tr. II, 4, 39.)

On March 22, 2017, CSI sent its initial offer to SPC.  (3/22/2017 CSI Initial Offer, Pl.'s Ex. 100.)  In this initial offer, CSI proposed to purchase 100% of SPC's assets at a purchase price of $35,000,000 plus a contingency payment of $6,500,000 tied to CSI's earnings before interest, taxes, depreciation, and amortization ("EBITDA").  If SPC wanted to maintain ownership of the dock on Parcel 4, CSI proposed an alternative purchase price of $30,000,000 along with the same contingency payment and "a throughput fee per ton payable to [S]and [P]roducts for the life of the mine."  (*Id.*)  As LaPrairie explained, "[a] throughput fee per ton is basically -- a royalty." (Tr. I, 38.)

In an email exchange dated March 28, 2017, between McKee, Canestraight, and Musselman, McKee proposed adding a restriction to SPC's counteroffer that would require CSI to perform "[n]o other operations other than current without SPC approval."  (3/28/2017 SPC Email Exchange, Pl.'s Ex. 101.)  Musselman responded, "I don't follow the 'no other operations'

restriction[.] [W]hat are we preventing them from doing? I have no idea what we are preventing

them from doing but we may not want it, whatever it might be." (*Id.*)  Canestraight also responded,

> If they are running Brevort at peak numbers and Graymont is up and running I'm
> not sure what else they will be able to do w[ith] the Brevort dock, but I'm also not
> sure why we would care what they do . . . . None of us is capable of seeing all in
> the future and what might materialize . . . . I guess if no one can think of another
> use, what's the harm in having such a clause.

(*Id.*)  This proposed restriction did not appear in SPC's counteroffers.

On April 3, 2017, SPC responded with its first counteroffer.  (4/3/2017 SPC Counteroffer,

Pl.'s Ex. 103.)  SPC, wanting to retain ownership of the dock on Parcel 4, proposed that CSI

purchase "all assets of the sand mining operations, washing operations and various drying

operations which are part of the business" for $37,000,000 but lease "[t]he land south of US

highway 2" for $250,000 per year, increasing at a rate of 2% each year.  (*Id.*)  It also replaced the

contingency payment tied to CSI's EBITDA results with a royalty of "$0.80 per ton for every ton

of sand sold in a calendar year."  (*Id.*)  SPC says it intended the royalty to apply to sand mined

from the Brevort mine.  (Tr. I, 234.)  CSI, on the other hand, says it interpreted the royalty as

applying to *all* sand sold, not only sand mined from the Brevort mine.  (*Id.* at 41.)

On April 4, 2017, CSI sent its own counteroffer.  (4/4/2017 CSI Counteroffer, Pl.'s Ex.

104.)  CSI agreed to the purchase price but aimed to "convert [the transaction] from a fixed fee per

year plus a royalty to a complete variable fee structure tied to [its] production."  (Tr. I, 45.)

Accordingly, CSI offered "to pay a royalty of $1.00 per ton sold[.]"  (4/4/2017 CSI Counteroffer.)

SPC again says it interpreted the royalty as applying to sand mined from the Brevort mine only.

(Tr. I, 235.)  CSI again says it believed the royalty covered all sand sold.  (*Id.* at 46.)

Finally, on May 1, 2017, SPC made its final counteroffer.  (5/1/2017 SPC Final

Counteroffer, Pl.'s Ex. 107.)  SPC reinserted the fixed lease payment and added a royalty "for each

ton of *proppant* sand sold for use in the regions named as follows . . . ."  (*Id.* (emphasis added).)

Canestraight testified that SPC moved away from a royalty on *all* sand to a royalty on *proppant* or

frac sand during the course of negotiations because

> [t]he base tonnage out of Brevort, was -- we didn't see it having the same growth
> potential as the frac sand, so if you were to quantify what a dollar for all the
> potential growth in frac sand might be, it was our calculation and belief that it would
> probably exceed a lesser [royalty] on all sand[.]

(Tr. I, 236-237.)  SPC also added a right of first refusal to its final counteroffer: "[i]f CSI desires

to sell the Brevort, MI land for any activity unrelated to mining, Sand Products Corporation shall

have a Right of First Refusal to repurchase the land."  (5/1/2017 SPC Final Counteroffer.)

This back and forth culminated in a Letter of Intent signed by both parties that

"summariz[es] and evidenc[es] the discussions of the parties through" the date of signing, May 3,

2017.  (Letter of Intent, Pl.'s Ex. 108.)

**B. The Ultimate Transaction**

The final transaction between SPC and CSI consists of a series of documents, including:

the Lease, Purchase and Sale Agreement ("Purchase and Sale Agreement"); the Northern Michigan

Promissory Note ("Promissory Note"); the Lease Agreement; and the Royalty Agreement.  (Stip.

Fact E, PageID.2416.)

On November 22, 2017, the parties executed the Purchase and Sale Agreement.  Under this

agreement, CSI purchased Parcel 2, received an option to purchase a portion of Parcel 1, and leased

Parcels 3 and 4 on a non-exclusive basis.  (*See* Purchase & Sale Agreement, Pl.'s Ex. 111.)  CSI

agreed to pay $37,000,000, a portion of which was to be paid at closing with the remaining

$22,000,000 to be financed by SPC.  (*Id.*; *see also* Tr. I, 69.)  CSI gave SPC the Promissory Note

for the financed portion.  (Promissory Note, Def.'s Ex. N.)

On November 30, 2017, the parties entered into the Lease Agreement.  Under this

Agreement, CSI agreed to pay SPC an annual rent of $250,000 with a 2% annual increase for fifty

5

years.  (*See* Lease Agreement, Def.'s Ex. G.)  The Lease Agreement further provided CSI with

two options to extend the lease for an additional 25 years each.  (*Id.*)  It also contains the contractual

language at issue in this dispute.  Section 1.4 of the Lease Agreement states that

> [t]he purpose of this Lease is to enable the Tenant to access and use the Premises
> to mine, process, and ship sand (collectively, the "**Sand Rights**").  Tenant's Sand
> Rights are subject to Graymont's rights under the Access Agreement.

(*Id.* (emphasis in original).)  As it relates to CSI's "Sand Rights," the Lease Agreement further

states in Section 4.1 that

> Tenant shall only use the Premises to exercise its Sand Rights and shall not use or
> allow the use of the Premises for any unlawful purpose, or in violation of any
> certificate or permit covering or affecting the Premises or any part thereof.  Tenant
> shall not suffer any act to be done or any condition to exist on the Premises or any
> part thereof which may in law constitute a nuisance, public or private, or which
> may make void or voidable any insurance with respect thereto.

(*Id.*)

Finally, on January 30, 2018, the parties executed the Royalty Agreement.  It provides that

"CSI shall pay to SPC a royalty (the "Royalty") for proppant sand extracted from the Michigan

Mining Real Property[.]"  (Royalty Agreement, Pl.'s Ex. 113.)  This royalty matched the royalty

described in SPC's final counteroffer and the Letter of Intent.  (Tr. I, 69.)  Similar to Canestraight,

McKee explained that the reason "the initial royalty agreement set a buck for frac sand [was]

because [SPC] thought it was going to be all frac sand the way the discussions went, and never

was anything else discussed."  (Tr. II, 8.)

LaPrairie testified that in 2019, approximately a year after executing the Royalty

Agreement, CSI "came to the realization [that it was] spending more capital than [it] had

anticipated in order to try to up [its] sales volumes, and simultaneously some of the oil field

services markets had taken a downturn[.]"  (Tr. I, 69.)  So, CSI asked SPC to refinance the

Promissory Note.  (*Id.*)  As part of the debt restructuring, the parties negotiated changes to the Royalty Agreement and the Promissory Note.

 Effective January 1, 2020, the parties entered into an Amended Royalty Agreement.  (Stip. Fact H, PageID.2416.)  Under the Amended Royalty Agreement, "CSI shall pay to SPC a royalty (the 'Royalty') for all sand (not only proppant sand) extracted from the Michigan Mining Real Property."  (Am. Royalty Agreement, Pl.'s Ex. 114.)  LaPrairie testified that, as part of this renegotiation, SPC never asked CSI for a royalty on all sand *shipped* from Brevort.  (Tr. I, 70.)  Also on January 1, 2020, the parties amended the Promissory Note to reflect the negotiated restructuring.  (*See* Am. Promissory Note, Def.'s Ex. O.)

### C. The Present Dispute

In the fall of 2019, while negotiating the Amended Royalty Agreement, CSI discussed its plans to enter the concrete sand market with SPC.  In an email to McKee on October 29, 2019, Canestraight stated that, "[LaPrairie] went on to say that the development of the concrete sand market is something they are very excited about, and that those tons should be lucrative enough to warrant a royalty."  (10/29/2019 Canestraight Email, Pl.'s Ex. 116.)  In a November 11, 2019, email, LaPrairie wrote to Canestraight saying, "[W]e remain actively bidding on new large volume work as I described to you earlier. So[,] we know we can see some light on the other side here along with our positive movements in the concrete markets out of Brevort."  (11/11/2019 LaPrairie Email, Pl.'s Ex. 118.)  However, Musselman testified that at the time SPC agreed to amend the Promissory Note and Royalty Agreement, there were no discussions about importing sand onto the property.  (Tr. II, 47.)

In 2020, a dispute arose between SPC and CSI over CSI's use of Parcels 3 and 4 to enter the concrete sand market.  (Stip. Fact I, PageID.2416.)  In June 2020, Canestraight "dropped through the Brevort plant over the weekend" and noticed some "material processing and handling

equipment on the plant side." (*See* 6/8/2020 Canestraight Email, Def.'s Ex. II.)  After Canestraight inquired about the equipment, LaPrairie sent him an internal planning document titled "Brevort Concrete Aggregate Production Overview" ("Concrete Aggregate Plan").  (6/9/2020 LaPrairie Email, Def.'s Ex. JJ.)

Under the Concrete Aggregate Plan, CSI would develop "a new product line" from Brevort "that will include washed concrete aggregate and washed concrete sand products" for use in the construction industry.  (*Id.*)  To make these products, CSI would import crushed limestone, wash and sort it into three separate components, and then blend the three components to produce three concrete aggregate types: 6AA Concrete Rock, 26A Concrete Rock, and 2NS Concrete Sand.  (*Id.*)

As stipulated by the parties, sand "is a heterogeneous mixture of minerals where the proportion of the size of the particles that pass through a #4 mesh (4.75 mm) exceeds 50% with no more than 50% passing through a #200 mesh (80 micron)."  (Stip. Fact J, PageID.2416.)  2NS Concrete Sand is "[a] concrete product composed of 30-40 percent manufactured and washed sand and 60-70 percent sand mined from the Brevort Mine[.]"  (Stip. Fact K, PageID.2416.)  Because of its size, 2NS Concrete Sand meets the definition of sand.  (*Id.*)  However, 6AA and 26A, "which are composed of -1/2" rock or larger aggregates," do not meet the definition of sand.  (Stip. Fact L, PageID.2416.)

Under the Concrete Aggregate Plan, CSI anticipated that it would operate 24 hours per day and estimated that the production rate for the crushing and washing operations would be 150 tons per hour.  (6/9/2020 LaPrairie Email.)  In April 2020, CSI had secured an order to sell the 6AA Concrete Rock and 2NS Concrete Sand to Hercules Concrete, LLC.  (Hercules Order, Def.'s Ex. FF; Hercules Invoice, Def.'s Ex. GG.)  LaPrairie testified that Hercules terminated their order because CSI "had too much ambiguity in [their] negotiations with [SPC], and [SPC] had threatened

us that we were voiding our lease[.]" (Tr. I, 124.)  However, seemingly prior to the termination, on November 22, 2020, CSI shipped the 6AA Concrete Rock and 2NS Concrete Sand from the Brevort dock to Hercules.  (Shippers Certificate of Weight, Def.'s Ex. PP; *see also* Tr. I, 110-111.)

SPC, in addition to believing that the Concrete Aggregate Plan exceeded CSI's Sand Rights under the Lease Agreement, expressed concerns about "geotechnical integrity, layout of the system, water balance, pond use, NPDES discharge standards, and endangered species near the site." (6/9/2020 Canestraight Email, Pl.'s Ex. 125.)  In light of these disagreements, SPC requested a further modification to the Amended Royalty Agreement to include a royalty on "ALL materials shipped from Brevort, be it Brevort sand, limestone, or limestone/sand blends[.]" (*Id.*)  The parties could not come to an agreement on their own, and CSI filed the instant suit.

## II. CLAIM

CSI seeks a declaratory judgment under 28 U.S.C. § 2201(a) against SPC declaring

A.  That processing, storing and selling the [2NS Concrete Sand] from the Processing Parcel and Dock Parcel does not violate the parties' agreement;

B. That [CSI] is not required to pay [SPC] royalties on the total weight of the [2NS Concrete Sand] sold;

C. That [SPC] is only entitled to a royalty on the portion of the [2NS Concrete Sand] mined from [Brevort];

D. That [SPC] shall refund to [CSI] any royalties paid from the sale of the [2NS Concrete Sand] that exceeded the weight of the sand mined from [Brevort];

E. That [CSI] be awarded all further relief the Court deems just.

(Compl. ¶ 52, ECF No. 1.)  CSI's requested declaratory relief turns on the interpretation of "Sand Rights" as described in § 1.4 of the Lease Agreement.

## III. CONCLUSIONS OF LAW

"'Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement. When interpreting a contract, [the Court's] primary

obligation is to give effect to the parties' intention at the time they entered into the contract. To do so, [the Court] examine[s] the language of the contract according to its plain and ordinary meaning.'" *Cnty. of Ingham v. Mich. Cnty. Rd. Comm'n Self-Ins. Pool*, 975 N.W.2d 826, 834 (Mich. 2021) (quoting *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870 (Mich. 2016)). "'However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties.'" *Kendzierski v. Macomb Cnty.*, 931 N.W.2d 604, 612 (Mich. 2019) (quoting *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008)).  And "it is well settled that the meaning of an ambiguous contract is a question of fact" that must be resolved by the factfinder. *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003) (citing *Hewett Grocery Co. v. Biddle Purchasing Co.*, 286 N.W.2d 221, 226 (Mich. 1939)).

At the summary judgment stage, the Court found that the meaning of § 1.4 of the Lease Agreement is ambiguous.  (*See* 11/26/2022 Op., ECF No. 107, PageID.2285-2286.)  Following the bench trial where the parties presented extrinsic evidence, the Court must now determine its meaning.

CSI contends that nothing in § 1.4 limits it to mining, processing, and shipping only sand extracted from the Brevort mine; rather, § 1.4 permits CSI to mine, process, and ship the 2NS Concrete Sand, a non-Brevort sand.  SPC, on the other hand, contends that the phrase "to mine, process, and ship sand (collectively, the '**Sand Rights**')" must be read as a collective unit such that the only sand that can be mined, processed, *and* shipped on the Brevort property is Brevort sand.  (Lease Agreement (emphasis in original).)

To interpret an ambiguous contract, "the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning."  *Klapp*, 663 N.W.2d at 454 (citing 11 Williston,

Contracts § 30:7 (4th ed.)).  "In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, [the factfinder] is to consider relevant extrinsic evidence . . . 'particularly evidence which would indicate the contemporaneous understanding of the parties[.]'"  *Id.* (quoting *Penzien v. Dielectric Prods. Eng'g Co.*, 132 N.W.2d 130, 132 (Mich. 1965)).

As an initial matter, the Purchase and Sale Agreement, the Lease Agreement, and the Royalty Agreement must be considered together when determining the meaning of § 1.4.  "[W]hen parties enter into multiple agreements relating to the same subject-matter, [the Court] must read those agreements together to determine the parties' intentions."  *Wyandotte Elec. Supply Co. v. Elec. Tech. Sys., Inc.*, 881 N.W.2d 95, 105 (Mich. 2016) (citing *Culver v. Castro*, 338 N.W.2d 232, 234 (Mich. 1983)).  And "'where one writing refers to another[,]'" as they do here, "'the two writings are to be construed together.'"  *Smith Living Tr. v. Erickson Ret. Cmtys.*, 928 N.W.2d 227, 240 (Mich. Ct. App. 2018) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 605 n.27 (Mich. 1992)); *see also Culver*, 338 N.W.2d at 234.  Accordingly, extrinsic evidence relating to all three agreements is relevant.

### A. The Scope of "Sand Rights" in § 1.4

The Court's analysis of the parties' intent as it relates to § 1.4 begins with their negotiations. Following CSI's initial offer, McKee proposed adding a clause to SPC's counteroffer requiring CSI to perform "[n]o other operations other than current without SPC approval."  (3/28/2017 SPC Email Exchange.)  Canestraight responded to McKee's proposed restriction, stating,

> If [CSI is] running Brevort at peak numbers and Graymont is up and running I'm not sure what else they will be able to do w[ith] the Brevort dock, but I'm also not sure why we would care what they do . . . .

(*Id.*)  McKee's proposed restriction neither appears in SPC's counteroffers nor in the Letter of Intent and ultimate transaction between the parties.  This omission suggests that SPC contemplated

11

that CSI could expand or diversify its historic operations but ultimately cared more about maximizing the profitability of the Brevort mine.

The changes in the royalty structure throughout the parties' negotiations likewise suggest that SPC considered the idea that CSI would expand the business to other sand markets.  In its first counteroffer on April 3, 2017, SPC proposed a royalty of "$0.80 per ton for every ton of *sand* sold in a calendar year."  (4/3/2017 SPC Counteroffer (emphasis added).)  The plain language of this counteroffer suggests that SPC sought a royalty payment for all sand that CSI sold, without limitation.  On May 1, 2017, SPC made its final counteroffer that included a royalty on "each ton of *proppant sand* sold[.]"  (5/1/2017 SPC Final Counteroffer (emphasis added).)  Rather than limiting the royalty to only sand mined from the Brevort mine, SPC chose to limit the royalty to frac sand.

SPC's reasoning behind limiting the royalty structure to proppant sand during negotiations further demonstrates that SPC was most concerned about their bottom line, not necessarily whether CSI would enter other sand markets.  Canestraight explained that

> [t]he base tonnage out of Brevort, was -- we didn't see it having the same growth potential as the frac sand, so if you were going to quantify what a dollar for all the potential growth in frac sand might be, it was our calculation and belief that it would probably exceed a lesser [royalty] on all sand[.]

(Tr. I, 236-237.)

Finally, when presented with an opportunity to expand the scope of the royalty payments, SPC declined to do so.  In 2019, CSI asked to refinance the Promissory Note.  As part of the debt restructuring, the parties negotiated changes to the Royalty Agreement.  While negotiating the Amended Royalty Agreement, CSI discussed its plans to enter the concrete sand market with SPC and the royalties SPC could receive on it.  In an email to McKee on October 29, 2019, Canestraight stated, "[LaPrairie] went on to say that the development of the concrete sand market is something

they are very excited about, and that those tons should be lucrative enough to warrant a royalty."
(10/29/2019 Canestraight Email.)  Despite this knowledge, SPC did not negotiate the Amended
Royalty Agreement to include a royalty on concrete sand or all sand shipped from Brevort.  Instead,
under the Amended Royalty Agreement, "CSI shall pay to SPC a royalty (the 'Royalty') for all
sand (not only proppant sand) *extracted from* the Michigan Mining Real Property."  (Am. Royalty
Agreement (emphasis added).)

      In sum, the extrinsic evidence presented during trial suggests that during the parties'
negotiations and renegotiations of the transaction, SPC contemplated whether CSI would expand
or diversify the historical operations of the Brevort mine.  Despite this, SPC declined to explicitly
include such a restriction in the Lease Agreement.  Similarly, SPC chose to limit CSI's royalty
payments from "all sand" to "proppant sand."  Finally, when presented with an opportunity years
later to expand the scope of the Royalty Agreement to again include a royalty on all sand—whether
mined from the Brevort mine or not—SPC declined to do so.

      As explained by the Michigan Supreme Court, contractual interpretation should not
"reward imprecision in the drafting of contracts" or "create an incentive for an aggrieved party to
enlist the judiciary in an attempt to achieve a benefit that the party itself was unable to secure in
negotiating the original contract[.]"  *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*,
702 N.W.2d 106, 124 (Mich. 2005).  SPC's request to modify the Amended Royalty Agreement
in 2020 to include a royalty on "ALL materials shipped from Brevort, be it Brevort sand, limestone,
or limestone sand/blends[,]" suggests that SPC now seeks a benefit it did not secure at the time of
contracting.  (6/9/2020 Canestraight Email.)  In light of the evidence presented during trial, the
Court declines to read SPC's proposed restriction into § 1.4 of the Lease Agreement.  The Sand
Rights are individual, not collective rights, to mine sand, to process sand, and to ship sand.  Thus,

13

sand that is processed or shipped from the Brevort property need not be the sand that is mined from the Brevort property.

The Court's interpretation of § 1.4 is also supported by the Lease Agreement itself. Section 14.1 states, in relevant part, that CSI "may make any improvements, alterations, additions or physical changes to the Premises that are directly related to the mining, processing, and/or shipping of sand without obtaining [SPC's] consent or approval . . . ." (Lease Agreement.)  Were CSI's "Sand Rights" a single collective right, then the use of "and/or" in § 14.1 would be superfluous.  The Court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp*, 663 N.W.2d at 453.

SPC's arguments in support of its proposed interpretation of § 1.4 are unpersuasive.  First, SPC argues that because the parties did not understand the scope of § 1.4 in the same way, the provision must be interpreted in a manner that both parties would have been aware of at the time of contracting.  (*See* SPC's Post-Trial Br., ECF No. 138, PageID.2877.)  In support of this proposition, SPC cites *United States v. Stuart*, 489 U.S. 353 (1989).  In a footnote the Supreme Court explained that,

> [i]t is hornbook contract law that the proper construction of an agreement is that given by one of the parties when "that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party."

(*Id.* at 368 n.7 (quoting Restatement (Second) of Contracts § 201(2)(b) (1981)).  Here, CSI intended to expand SPC's historical business model to include non-Brevort sands but "didn't tell them that . . . [b]ecause that would have made them think or realize that perhaps they're undervaluing their asset." (Tr. I, 43.)  Essentially, CSI made a strategic business decision to not voluntarily share their plans.

14

However, CSI did not have reason to know of a different meaning attached by SPC in the Lease Agreement.  SPC sought a "fully integrated" buyer for its business to "help expand the sales out of that mine." (*Id.* at 171.)  CSI similarly believed that SPC "saw [its] ability to move products into the market as a way for them to get additional variable compensation via the royalties." (*Id.* at 57.)  But SPC did not express its expectation that CSI would "utilize the sand business in the same line of production and logistics and distribution," either verbally or in writing. (*Id.* at 171.)  LaPrairie testified that SPC "never asked us every single product type we would plan to produce or sell" during their negotiations, and Canestraight conceded that he never posed the question to CSI. (*Id.* at 44, 168.)  SPC's written counteroffers also failed to include a restriction limiting CSI to operating the business as SPC had done in the past.  In fact, SPC considered adding such a restriction but ultimately decided it did not care what CSI did so long as it operated the Brevort mine at its maximum capacity. (*See* 3/28/2017 SPC Email Exchange.)  Accordingly, SPC gave CSI no reason to know that SPC interpreted § 1.4 of the Lease Agreement to limit CSI to conducting historic operations at Brevort.

Next, SPC argues that allowing CSI to mine, process, and ship 2NS Concrete Sand would conflict provisions in the Lease Agreement that prohibit CSI from interfering with Graymont's rights under an Access Agreement. (*See* SPC's Post-Trial Br., PageID.2875.)  Section 14.1 of the Lease Agreement provides that

> [s]o long as [CSI] do[es] not adversely affect Graymont's rights under the Access Agreement, [CSI] may make any improvements, alterations, additions or physical changes to the Premises that are directly related to the mining, processing and/or shipping of sand without obtaining [SPC's] consent or approval.

(Lease Agreement.)  Section 36.2 reiterates that CSI's "use of the leased Premises shall be subject and subordinate to the rights of Graymont as established and set forth in the Access Agreement." (*Id.*)  However, CSI mining, processing, and shipping 2NS Concrete Sand does not conflict with

these provisions.  CSI's rights remain subordinate to Graymont's rights, and CSI must continue to operate the leased premises accordingly.

Finally, SPC argues that allowing CSI to mine, process, and ship 2NS Concrete Sand "creates a risk of violating existing regulatory permits" which conflicts with § 4.1 of the Lease Agreement.  Section 4.1 requires that CSI

> only use the Premises to exercise its Sand Rights and shall not use or allow the use of the Premises for any unlawful purpose, or in violation of any certificate or permit covering or affecting the Premises or any part thereof.

(*Id.*)  The Court's interpretation of § 1.4 does not conflict with § 4.1 because a risk of violating existing regulatory permits does not guarantee such violations.  CSI must mine, process, and ship sand in accordance with § 4.1.  SPC further points out that CSI has already received a notice relating to "the discharge water standards at the plant."  (Tr. I, 263.)  Such a notice suggests that CSI's current operations may be in violation of § 4.1, but, again, it does not indicate that CSI cannot mine, process, and ship 2NS Concrete Sand under any circumstances without violating § 4.1.

In conclusion, the Court finds that § 1.4 of the Lease Agreement enumerates CSI's individual, not collective, rights to mine sand, to process sand, and to ship sand, which are collectively known as CSI's "Sand Rights."  This interpretation permits CSI to mine 2NS Concrete Sand, to process 2NS Concrete Sand, and to ship 2NS Concrete Sand.

### B. The Meaning of "Process" within § 1.4

Having determined that CSI's "Sand Rights" are individual rights to mine sand, to process sand, and to ship sand, the Court must now interpret the term "process" as used in § 1.4.  As an initial matter, it is difficult to discern precisely how CSI interprets "process."  When asked whether "process" includes the right to import material that does not meet the definition of sand onto the property, LaPrairie gave two different answers.  First, he testified that CSI is "asking the Court to

16

clarify that [it] would have the right to do that today." (Tr. I, 121.) He then testified that he "do[esn't] think [CSI] is asking for the Court to give [it] the right to do that." (*Id.* at 122.) The undersigned also asked LaPrairie to describe the process of making concrete sand. He testified that before being combined with sand from the Brevort mine, the limestone sand is brought to the leased premises by truck. (*Id.* at 127.)

SPC, on the other hand, argues that "process," as used in § 1.4, does not permit CSI to truck crushed limestone onto the leased premises to then be further crushed, washed, separated, and combined with sand from the Brevort mine to make concrete sand. In light of these potentially differing interpretations, the Court will proceed to interpret the term "process" as used in § 1.4 of the Lease Agreement. The Court looks to its ordinary meaning and can resort to dictionary definitions when doing so. *See Cowles v. Bank West*, 719 N.W.2d 94, 112 (Mich. 2006) ("Resort to dictionary definitions is acceptable and useful in determining ordinary meaning.").

According to the Cambridge Dictionary, to "process" means "to prepare, change, or treat food or natural substances as part of an industrial operation." *Process*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/process. According, to the Oxford English Dictionary, to "process" means to "[t]o subject to or treat by a special process; to operate mechanically or chemically . . . to preserve or alter [] in this way." *Process*, Oxford English Dictionary, https://www.oed.com/dictionary/process_v1?tab=meaning_and_use#28495664. It further provides an illustrative example: "Wanganui Trawlers Ltd has over 20 years of experience in catching, processing and exporting a wide range of New Zealand finfish and squid." (*Id.*) Based on the aforementioned definitions, this sentence means that the finfish and squid are caught, processed, and exported as finfish and squid. In other words, they are finfish and squid before and after the processing occurs. Here, CSI seeks to truck crushed limestone rock to the leased premises

and transform it into limestone sand.  This does not fall within the meaning of processing sand as used in § 1.4.

The Court interprets "process" as processing sand only; in other words, processing "a heterogenous mixture of minerals where the proportion of the size of the particles that pass through a #4 mesh (4.75mm) exceeds 50%, with no more than 50% passing through a #200 mesh (80 micron)."  (Stip. Fact J.)  The material must contain sand before and after the processing occurs. So, trucking limestone sand to the premises, washing it, and combining it in the requisite proportions with sand mined from the Brevort mine qualifies as processing sand; however, trucking crushed limestone rock and transforming it into limestone sand does not.

The way that sand from the Brevort mine is processed at the Brevort property supports the Court's interpretation.  The sand is mined in its natural state from the mine on Parcel 2.  It is then transported across U.S. Highway 2 to Parcel 4 for processing and shipping.  Processing this sand requires "an initial screening of oversize trees and roots" that produces a junk pile.  (Tr. I, 210-211.)  The sand then goes through a "wet screening," which makes a "cut" that eliminates the oversized pieces.  (*Id.* at 216-217.)  It is then cleaned and sent through "cyclones" to make another "cut" that eliminates the undersized pieces.  (*Id.* at 217.)  Most importantly, the sand from the Brevort mine exists in sand form before and after the processing takes place.  It is not a larger material that is then crushed to make sand.

Furthermore, CSI has provided no evidence suggesting that the parties intended the term "process" in § 1.4 to include crushing rock into sand.  Indeed, the evidence suggests that, at the time of contracting, the parties only had sand in mind.  When asked what products CSI sells, LaPrairie testified that

> We sell concrete sands. We sell something called asphalt sands which they mix
> sands into asphalt materials when they construct roads. We sell filtration sands,

18

which are used for water filtration applications. We sell foundry sands which are used in the -- in foundries for casting materials. We sell road construction sands . . . . We sell sands that go into glass manufacturing for bottles, for windshields, for, you know, glass on buildings. We sell sands that go into oil field applications, which we call frac sands, and there's various grades of frac sands. Some of those frac sands are also multiple sands that are blended together from multiple sources to meet certain end product specifications depending on our customer base and their requirements for [the] characteristics of those sands in that particular application, so there's a very broad use case for sands, and we try to touch all aspects of that market.

(Tr. I, 14-15.)  SPC was also in the sand business.  Canestraight testified that before entering into the transaction with CSI, SPC created business value by moving almost all of the sand extracted from the Brevort mine to different regions that did not have access to natural sand reserves.  (*Id.* at 212.)  If, by entering into the transaction, CSI intended "to pursue markets that [SPC] hadn't historically sold into," then it is reasonable to assume that CSI intended to mine *sand*, process *sand*, and ship *sand* into new *sand* markets.  (*Id.* at 28.)

Thus, the Court interprets the verb "process" as used in § 1.4 of the Lease Agreement as processing sand only, not transforming crushed limestone rock into limestone sand.  The latter is better described as processing rock to make sand, not processing sand.

### IV. CONCLUSION

For the reasons stated above, the Court interprets CSI's "Sand Rights" in § 1.4 of the Lease Agreement as individual rights to mine sand, to process sand, and to ship sand.  The term "process," as used in § 1.4, does not include crushing rock to make sand.

A judgment will enter in accordance with this Opinion.

Dated: August 8, 2023                              /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   CHIEF UNITED STATES DISTRICT JUDGE

19